EPSTEIN BECKER & GREEN, P.C.
Michael A. Kalish
Carrie Corcoran
250 Park Avenue
New York, New York  10177-1211
(212) 351-4500
Attorneys for Defendant Verizon Communications

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| BARBARA BRYANT, | : | |
| Plaintiff, | : | **ECF CASE** |
| | : | |
| - against - | : | |
| | : | 05 CV 8112 (CM) (HBP) |
| VERIZON COMMUNICATIONS, | : | |
| COMMUNICATION WORKERS OF AMERICA | : | |
| LOCAL 1103 AND COMMUNICATIONS WORKERS | : | |
| OF AMERICA, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANT VERIZON COMMUNICATIONS'
RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant Verizon Communications ("Verizon"), by its attorneys, Epstein Becker & Green, P.C., pursuant to Local Civil Rule 56.1 of the United States District Court, Southern District of New York, hereby submits the following statement of material facts as to which there is no genuine issue to be tried.

**Plaintiff's Work History at Verizon**

1. Verizon hired plaintiff Barbara Bryant ("Bryant" or "Plaintiff"), an African American female, on February 27, 1978. [Exhibit 1][1]

---

[1] All Exhibits cited to herein are annexed to the Affirmation of Michael A. Kalish in Support of Defendants' Verizon Communications' Motion for Summary Judgment ("Kalish Affirmation").

2. Between 1980 and late 1997, Bryant held a series of clerical jobs. [Ex. 2 (Bryant),[2] at 19-21, 25-26, 29-33; Ex. 3; Ex. 4; Ex. 5; Ex. 6, at D 1169, D 1171]

3. In 1997, Bryant was promoted to "The Next Step Program," a special bargained-for program between Verizon and the union, by passing an exam and due to her seniority at Verizon. [Ex. 7, at D 3066; Ex. 6, at D 1169, D 1171; Ex. 8, at D 557; Ex. 9 (Gonzalez),[3] at 117-18]

4. Bryant became a Telecommunications Technical Associate ("TTA") at a significantly higher wage rate than Bryant had previously earned. [Ex. 6, at D 1169-71; Ex. 7, at D 3066; Ex. 10]  Being a TTA involved educational and employment opportunities and requirements. [Ex. 7, at D 3069]

5. TTAs attend college one day per week and have to maintain a 2.0 Grade Point Average. [Ex. 7, at D 3066-67]  Bryant failed two of the program's required courses, which resulted in her flunking out in early 2002. [Ex. 11, at D 1939]

6. Bryant took lengthy and frequent disability leaves during her time in the Next Step Program, which delayed her progress with the program's educational requirements. [Ex. 11; Ex. 12; Ex. 13, at D 1090; Ex. 14; Ex. 15, at D 1063 (reflecting that Bryant was out 140 days in 2000 and 97 days in 1999 (excluding vacation days and paid excused days))]

---

[2] Exhibit 2 of the Kalish Affirmation contains relevant excerpts of Plaintiff's deposition in this litigation, occurring on August 25, September 7, September 29, and November 2, 2006 and November 20, 2007.

[3] Exhibit 9 of the Kalish Affirmation contains relevant excerpts of the Fed. R. Civ. P. 30(b)(6) deposition of Verizon through its representative Carlos Gonzalez, occurring on November 30, 2007.

7. TTAs perform the work duties of a Field Technician (outside phone technician) and/or Central Office Technician (inside phone technician). [Ex. 7, at D 3066-67, D 3069] Verizon assigned Bryant to perform the duties of a Field Technician. [Ex. 16, at D 1474]

8. During the six-month probationary period provided by the Next Step Program, Verizon sought to have Bryant retreated to her former position because of her poor performance, but the union successfully persuaded Verizon to give Bryant a second chance. [Ex. 7, at D 3070; Ex. 17 (Sheil),[4] at 15-18]

9. During the September 1997 to early 2002 period when Bryant was a TTA, she never became qualified in her highly technical position. [Ex. 18, at D 873 (first half 1998 evaluation, "Barbara is not qualified to work alone yet"); Ex. 16, at D 1474-79 (second half 1998 evaluation, "Barbara is not qualified as field technician yet," "Barbara does less than 1 job per day," "needs to show marked improvement [in problem solving] in order to show that she is capable of doing this job"; "needs to improve in [technical proficiency], she is new in the field but behind others with the same time in title"); Ex. 19, at D 1199 (Year 2000 evaluation, "Not ratable due to technician had to be retrained after a lengthy illness"); Ex. 20, at 1185-86 (Year 2001 evaluation, "appears lost at work," "needs to learn all aspects of job again and again," and "has improved but is still not close to others in gang")]

10. In 1999, Bryant voluntarily transferred from the organization in which she was struggling to the newly created Enterprise Solutions Group, which served premier business customers. [Ex. 21 (Stumpf),[5] at 61; Ex. 22 (Gonzalez Decl.),[6] at ¶ 2; Ex. 23, at D 1887-88]

---

[4] Exhibit 17 of the Kalish Affirmation contains relevant excerpts of the deposition of Kevin Sheil, occurring on November 27, 2007.

[5] Exhibit 21 of the Kalish Affirmation contains relevant excerpts of the deposition of William Stumpf, occurring on November 19, 2007.

11.     Due to Bryant's inability to grasp even the basics of her technical position, her supervisors sent her to Basic Installation school three times (cumulatively, 120 hours of training) and Basic Repair school twice (56 hours).  [Ex. 24, at D 1624; Ex. 2 (Bryant), at 54, 74]

12.     Bryant's supervisors sought to enhance Bryant's on-the-job training by assigning her to work with more experienced technicians for months at a time.  [Ex. 25; Ex. 26; Ex. 2 (Bryant), at 47-48, 71-74]  However, Bryant showed little improvement and remained far below her colleagues in both aptitude and production.  [Ex. 20]

13.     On November 16, 1999, Bryant reported to her therapist that she "lately does not feel like she has 'a good handle – grasp[] of her job.'"  [Ex 23, at D 1872]

14.     On November 16, 1999, Bryant reported to her therapist that she feels "harassed at work . . . *because low production*."  [Id. (emphasis added)]  In a February 2000 session, Bryant told her therapist she "continues to feel like she is being 'harassed' at work" in the context of her performance deficiencies.  [Id., at D 1877; cf. Ex. 2 (Bryant), at 164, 169-70]  Bryant testified that her supervisors counseled her on her need to work faster during this time period.  [Id., at 59-60; 62-63]

15.     On November 23, 1999, Bryant reported to her therapist that "there are times that she 'forgets' and 'worries['] of not being able to 'grasp' everything her job requires."  [Ex. 23, at D 1872]  On February 8, 2000, Bryant informed her therapist that "[s]ometimes she gets confused with wires/cables" and "gets 'stuck' and 'forgets' what to do at a job."  [Id., at D 1877]

---

[6]     Exhibit 22 of the Kalish Affirmation contains a true and correct copy of the Declaration of Carlos Gonzalez, sworn to on May 31, 2007.

16. Bryant visited this therapist during her lengthy disability absence in 2000, and reported that she worried about her ability "to handle job since she's been out for so long." [Id., at D 1889 (June 20, 2000 session)]

17. Bryant's therapist suggested that Bryant review her job materials, but Bryant failed to do so. [Id., at D 1886 (April 4, 2000 session, "reports finding her books but has not looked at them yet"); id., at D 1887-88 (May 23, 2000 session, reminded Bryant "to start reviewing school materials at least 1 hour per day so that she can refresh herself"); id., at D 1889 (on June 27, 2000, "[s]he has not reviewed any of materials")]

18. In February 2001, after Bryant had been performing Field Technician tasks for several years, her supervisor, Bill Damson, met with her and union representatives to discuss her "inability to perform her everyday tasks as a field technician." [Ex. 26] The union questioned Bryant about additional help it could provide, and Bryant responded "no you have done enough its me." [Id.; Ex. 27, at p.3] Verizon informed Bryant of Verizon's productivity requirements and the parties discussed a course of action that "[h]opefully . . . will help Barbara to learn the job and to be a productive employee." [Ex. 26] Damson explained that he "expected to see improvement as time progresses and that it would be required to avoid any further action or discipline." [Id.]

19. Bryant failed to improve and on November 16, 2001, Bryant was placed on Verizon's Service Excellence Plan due to her low productivity. [Ex. 28, at D 1288; Ex. 2 (Bryant), at 77; Ex. 29 (Mitchell),[7] at 37-38] After the union grieved, Verizon agreed to remove the warning and again "retrain [Bryant] w/ techs." [Ex. 30, at D 1188; Ex. 31]

---

[7] Exhibit 29 of the Kalish Affirmation contains a true and correct copy of a relevant excerpt of the deposition of Grant Mitchell, occurring on October 1, 2007.

20. Although Plaintiff did not satisfy the job requirements of the TTA position, she did not return to her former, lower-paying, and less-complicated job when she became academically ineligible for the Next Step Program in early 2002. [Exs. 32-34] Rather – due to an idiosyncrasy of the governing Collective Bargaining Agreement – she retreated to the job title of Field Technician and continued to perform the same technical duties she performed as a TTA. [Ex. 32; Ex. 8, at D 560; D 937; Ex. 35; Ex. 36]

21. Bryant's 2002 review noted that, Bryant "[h]as improved [her quality] but it seems to be a very slow improvement"; in the Customer Satisfaction/Service category, "Barbara seems lost at times needs to improve"; in Quantity/Productivity, "Below group standard . . . has gotten worse!!"; in Knowledge/Proficiency, Bryant has "[i]mproved but still not where she should be at this time in her career"; and in Problem Solving/Decision Making, Bryant was "[s]till lost on her jobs needs help many times with simple tasks." [Ex. 37] Overall, she was rated "IN" or "Improvement Needed to Meet Position Requirements." [Id., at D 1210]

22. In 2002, Bryant was absent for 51 work days, excluding 20 days of vacation, 4 paid personal days, and 1 unpaid personal day. [Ex. 38] In 2003, Bryant was absent 219 working days, excluding 24 vacation days, 4 paid personal days, and at least 2 unpaid personal days. [Ex. 39]

23. In Bryant's evaluation for the first half of 2003, her supervisor commented that he was "unable to rate tech [on quality since] out sick since feb[.] But for the most part needs to improve"; in the Quantity/Productivity category, she "needs improvement"; in Knowledge/Proficiency, Bryant "needs to improve"; in Problem Solving/Decision Making, Bryant "needs to make more of an effort"; and in Administrative/Organizational Skills, Bryant "needs to get it together." [Ex. 40]

24. In October 2003, Damson noted Bryant "at times . . . appeared lost." [Ex. 41] He offered to transfer her to an escort job in the Bronx (where Bryant lived) [Ex. 42], advising "it would be good for her" and "to think about it." [Ex. 41] Bryant refused his help. [Id.]

25. On March 5, 2004, Bryant's supervisor reported that Bryant tried to exchange an installation job for a repair job because "she has a problem with installs and wants to do only repairs." [Ex. 43]

26. In April 2004, Bryant was again placed on the Service Excellence Plan for her failure to meet company objectives concerning quality and productivity. [Ex. 44] She escalated to Step 2 of the plan in May 2004. [Ex. 45]

27. Bryant's performance problems also inspired her second-line supervisor, Pete Niles, to accompany her at a job location to see if she needed assistance. [Ex. 2 (Bryant), at 436-37]

**Requirements Concerning the Productive Use and Reporting of Work Time**

28. Field Technicians work independently in the field, using a Verizon vehicle, and on the premises of Verizon customers. [Ex. 46 (Moskala Decl.),[8] at ¶ 2; Ex. 36]

29. Verizon guards their time as a valuable resource and has long recognized that its business cannot function without strict enforcement of the mandate that employees perform work during their working time and accurately account for their time on company records. [Ex. 46 (Moskala Decl.), at ¶ 2; Ex. 47, at D 81, D 95-96] Bryant received the Code of Business Conduct and read it. [Ex. 2 (Bryant), at 190; Ex. 48 (2001); *see also* Ex. 49 (1997)]

---

[8] Exhibit 46 of the Kalish Affirmation is a true and correct copy of the Declaration of Richard L. Moskala, sworn to on May 31, 2007.

Moreover, she received training concerning its contents. [Ex. 24, at D 1624 (April 17, 1996), D 1623 (May 30, 2003)]

30.     Verizon takes work time violations so seriously that special rules apply to such violations. [Ex. 46 (Moskala Decl.), at ¶ 3.] In 1986, Verizon's predecessor and the union resolved issues concerning "the discipline of employees for [certain] improper employee activities in connection with work time . . . ." (the "1986 Work Time Agreement"). [Ex. 50]

31.     Pursuant to the 1986 Work Time Agreement, the discipline for a first work time violation is a suspension for up to 30 days. [Ex. 46 (Moskala Decl.), at ¶ 3; Ex. 50, at D 2] Further, an employee with greater than five years of seniority is terminated if she commits a second work time violation within a two-year period. [Ex. 50, at D 2] The agreement limits the union's right to arbitrate to the issue of whether or not the employee committed the violation. [Id.]

### Bryant's Work Time Violations

32.     <u>April 2001 Incident</u>:  In April 2001, despite having prior notice that her supervisor would be visiting the work site, Bryant arrived over an hour late from lunch. [Ex. 51; Bryant 64-65] She claimed she was getting supplies, but she was only functioning as a helper for the job. [Ex. 52; Ex. 2 (Bryant), at 66] She also claimed that she had taken a late lunch, but "lunch is 12 to 1 unless you call." [Ex. 52; Ex. 2 (Bryant), at 67, 70-71; Ex. 53; Ex. 54, at D 1654] Her supervisor placed her on written warning "for failure to follow work rules and procedure."   [Ex. 51, at D 1614]   Through the grievance procedure, her discipline was transmuted to a verbal warning. [Id., at D 1613]

33.     At her deposition, Bryant cited this incident as the first instance of discrimination against her. [Ex. 2 (Bryant), at 64, 71] With regard to gender discrimination, Bryant speculated that "maybe if I had been a guy and went to get supplies and stuff, I wouldn't

have been called on the carpet for it." [Id., at 123; see also id., at 173 (also claiming it was gender-based because the two other technicians (who were not late) "didn't get touched by [Damson's] tirade")]  Bryant believes race had something to do with this incident because "[i]t was basically an all-male white gang, and I guess maybe I didn't fit in" and further speculates "[m]aybe [Damson] had a thing against people of my persuasion.  I don't know." [Id., at 173-74]  Ronnie Bough, one of the other two technicians present, is African American. [Id., at 61]

        34.    <u>September 2001 Incident</u>:  In September 2001, her supervisor discovered that although Bryant's college classes had been cancelled in the wake of the terrorist events of September 11, 2001, Bryant was not attending work, which remained scheduled.  [Ex. 55]  Bryant's attendance records reflect that her supervisor did not discipline her in response to the union's request that Verizon show Bryant some latitude in light of national events.  [Id.]

        35.    <u>12/6/02 Work Time Violation</u>:  At 1:40 p.m. on December 6, 2002, Bryant received a work assignment at an FBI location.  [Ex. 56, at D 1549]  At the FBI, she argued with the customer about her identification card and the location of phone lines.  [Id.]  Bryant admits that the customer had complained about her conduct.  [Ex. 2 (Bryant), at 92-93]  Plaintiff then "ok'd the job, and never did it" and "left the job and did not return."  [Ex. 56, at D 1549]  After leaving the customer at approximately 2:30 p.m., she returned to her garage but did not call her manager or dispatch to obtain another job.  [Ex. 56, at D 1545-46; Ex. 57; Ex. 2 (Bryant), at 97]  For the approximately two hours remaining on her shift, "Bryant could not account for her time[.]"  [Ex. 56, at D 1549; Ex. 57]

        36.    At her deposition, Bryant admitted that her manager told her to call dispatch for a job.  [Ex. 2 (Bryant), at 92-93]  Bryant testified she "called dispatch [and] couldn't

get them." [Id., at 92]  She testified that she did not call her manager again that day. [Id., at 149-50]

37.  Damson "investigat[ed] this matter," including having "discussions with union Chief Steward," "visiting the job [site]," "talking with the customer," and interviewing Bryant. [Ex. 56, at D 1545-47, 1549]  He concluded that Bryant did not act professionally, that "[s]he ok'd the job without doing it" and "did not satisfactor[ily] account for her time." [Id., at 1549]  He recommended that she "[b]e suspended for 10 days for a work code violation [w]ith a 2 year [final warning]." [Id.]  He consulted Labor Relations and his supervisor. [Id., at D 1548; Ex. 58]

38.  Ultimately, Bryant was suspended for ten business days for a work time violation. [Ex. 59; Ex. 60]  Bryant's Notice of Suspension also "serve[d] as a written final warning . . . that if [Bryant] incur[red] a second Work time Violation within two (2) years **[she] will be separated from the payroll**." [Ex. 60 (emphasis in original)]  Plaintiff unsuccessfully grieved this discipline [Ex. 61], but the union did not arbitrate it.

39.  Bryant attributes this incident to the FBI's discriminatory tendencies. [Ex. 2 (Bryant), at 123, 179-82; cf. id., at 94]  However, she "would think" Verizon bore some blame for the FBI's sexism because the FBI "just passed the baton on to [Verizon] and they took it from there [and suspended her]." [Id., at 180]  She infers race discrimination by Verizon because "[t]hey handled it harshly, and I know they wouldn't have done it if it was a white male that went to do this job." [Id., at 182-83]  Bryant can provide no details of men who have allegedly engaged in similar conduct who were not disciplined. [Id. ("Whoever went there.  Names I'm not too sure of.")]

40. <u>4/5/04 Work Time Violation</u>: On April 5, 2004, Verizon supervisor William Stumpf witnessed Plaintiff walking to a bus stop at 4:05 p.m. – twenty-five minutes prior to the end of her shift. [Ex. 62]  He further witnessed her at the bus stop counting money. [Id.]  Stumpf confirmed that Bryant's truck was parked in the parking lot near that location (despite his explicit instructions on that day that she park at, and report to, a different Verizon location). [Id.]

41. At one session of her deposition, Bryant denied leaving work early or parking at the wrong garage; however she could point to no witnesses who could support her story. [Ex. 2 (Bryant), at 248-49, 308]  At a later session, Bryant claimed that she "was closing out [at the wrong garage]" and "I might have gone to the deli . . . because I didn't have lunch that day and I went across the street to get . . . something to eat.  And I came back to the garage and used the facilities and tried to pack my things . . . to get ready to go home.  By that time I think it was about 4:30." [Id., at 418-19]  She admitted she did not have management permission to go to the deli. [Id., at 419-20]  In any event, her time sheet for April 5, 2004 reflects that she did take lunch that day. [Ex. 63]

42. The April 5, 2004 work time violation was just one of several events during the week of April 5, 2004 where Stumpf observed that Bryant disregarded management edicts and/or not did not use her time productively. [Ex. 64; Ex. 65; Ex. 66]  Stumpf documented each of these events. [Ex. 62; Ex. 65; Ex. 66]

43. Niles, with whom Stumpf consulted concerning his observations, conducted an investigation. [Ex. 64; Ex. 62; Ex. 65; Ex. 66]  He interviewed Bryant and compared her answers to the documentation prepared by Stumpf. [Ex. 64, at D 1715; Ex. 67]  Niles consulted with Kathy Yizar, in Verizon's Labor Relations Department. [Ex. 68]

44. Ultimately, based on the information provided by Niles, Director Carlos Gonzalez decided to terminate Bryant for the work time violation. [Ex. 22 (Gonzalez Decl.), at ¶¶ 3-4]

45. Because Verizon determined that Bryant had committed another work-time violation while on final warning, Verizon informed Bryant on or about May 17, 2004 that it was suspending her for ten days pending her May 31, 2004 dismissal. [Ex. 69; Ex. 70] The union unsuccessfully grieved Bryant's termination [Ex. 71; Ex. 72], but did not arbitrate it [Ex. 2 (Bryant), at 332-33].

46. Bryant believes her termination resulted from race and gender discrimination because "I was the only black woman in my department at the time." [Id., at 686-87]

47. Bryant's personnel file reveals other instances in 2004 when her whereabouts were unclear or she was not using her time productively. [Ex. 73 (On February 20, Bryant called her supervisor at 8:50 a.m. claiming not to have received work from him, although he had sent it at 8:00 a.m.); Ex. 74 (on March 17, she was to pick up a laptop from a Verizon location, never showed up, and was unreachable for nearly two hours)]; Ex. 65 (on the morning of April 8, Bryant took two hours to arrive at her work site, and an additional hour to climb her ladder to begin work); Ex. 2 (Bryant), at 261-63; Ex. 66 (on the morning of April 9, Bryant was found at the wrong work location long after she should have been heading to her first job of the day).

48. The "Enterprise Basic Work Requirements" provided that: "<u>3. Technicians will leave the garage promptly after receiving their work assignment and proceed directly to the customer's location.</u>" [Ex. 54, at D 1654 (emphasis in original)]

**The Distribution of Equipment and Work Assignments**

49.  With respect to equipment, Bryant claims that she "got screwed when it came to supplies and trucks," that less senior technicians had superior equipment to her, and that she had difficulty in obtaining tools from the supplies department.  [Ex. 2 (Bryant), at 100-01; Ex. 75, at ¶ 8]

50.  Verizon distributes tools to technicians based on job duties and need.  [Ex. 9 (Gonzalez), at 118]  If technicians believe they are not getting tools they require they can go to management and their union can file a grievance.  [Id., at 119-21]  Seniority plays no role with regard to dispensing tools.  [Ex. 21 (Stumpf), at 47]  With respect to vehicles, seniority might only play a role when a new vehicle comes in and no old vehicle needs to be replaced.  [Ex. 9 (Gonzalez), at 130-31; Ex. 21 (Stumpf), at 45-46]

51.  Bryant never grieved her alleged equipment problems.  [Ex. 17 (Sheil), at 28]

52.  On April 13, 2004, Bryant mentioned to Verizon that items from her truck "keep[] coming up missing."  [Ex. 67, at D 1666]  This is the only document (preceding her termination) that reflects any tool-related concerns expressed by Bryant.  [Id.]

53.  Evidence reveals that Bryant did not safeguard her vehicle and tools.  [Ex. 66 (Bryant left van unattended with motor running); Ex. 76 (Galante found van parked with doors unlocked, key in ignition); Ex. 2 (Bryant), at 150-53 (Bryant "lost" her buzzer)]

54.  When questioned on April 13, 2004, Bryant stated:  "basically I have what I need."  [Ex. 67, at D 1666]  She reported borrowing a helmet and cones without problems and got a belt "when I asked."  [Id.]  When observed by her supervisor on April 8, 2004, Bryant possessed both a helmet and cones.  [Ex. 65]  With respect to a belt, she said on April 13, 2004, "I just got it last week when I asked."  [Ex. 67, at D 1666]

55. On April 13, 2004, Stumpf instructed Bryant "to give him a list of the items she needs and he will arrange for her to get those items." [Ex. 67, at D 1666] Bryant did not provide such list. [Id., at D 1667]

56. Plaintiff testified that after she "lost" her buzzer in the winter of 2001/2002 she borrowed buzzers from other technicians until she finally got a buzzer "when the supplies came in." [Ex. 2 (Bryant), at 150-51] Bryant can supply no details about how other technicians obtained buzzers, or whether they had lost their buzzers in the first place. [Id., at 152] Bryant possesses no evidence concerning other technicians' possession of rubber boots. [Id., at 153-55]

57. Bryant recognized that the supplies department operated on a first-come, first-served basis. When supplies would come in, "[i]t's like kids in a cookie place, they come and take everything. If I don't get there in time, that is it[.]" [Id., at 111-12] Bryant was frequently out of work [Id., at 117], and therefore missed opportunities to obtain equipment when it came in.

58. With respect to a vehicle, Bryant claims that, in 2002, when her truck was sent out to be serviced, she got a subpar replacement truck for two months, and was told by her foreman that's "all we got." [Id., at 112-13]

59. Bryant believes that her alleged equipment problems stemmed from gender discrimination due to an attitude that she was "not going to use" the equipment and therefore did not need it. [Id., at 184-85] With respect to race discrimination, Bryant testified that she was "quite sure" her race played a role in her alleged inability to obtain supplies because "[t]he fact that I was a black woman was the factor, was the reason. That was the only reason. That was enough reason." [Id., at 186-87, 213-14]

60. With respect to neighborhood assignments, Bryant testified that "a few times" her supervisors would send her out alone in dangerous locations such as "the projects" or a "dangerous dark basement or in the woods somewhere." [Id., at 203-204, 692] The Enterprise Group served premier large-business customers. [Ex. 9 (Gonzalez), at 123] Bryant could recall very few details and no addresses concerning these dangerous locations. [Ex. 2 (Bryant), at 705, 731-33]

61. Bryant also inconsistently claims that Verizon's dispatch center assigned her to a lot of "two-man areas" by herself in the late 2003 period [Id., at 203-04] when Bryant also claims she was working as an escort to other technicians [Id., at 196-98].

62. A Verizon technician who feels unsafe at the location s/he is assigned, can call her/his supervisor to request that another technician be sent to assist her/him. [Ex. 9 (Gonzalez), at 126] Under circumstances where a technician requests assistance for safety reasons, Verizon management always sends another technician. [Id., at 128]

63. On the occasions where Bryant was sent to a dangerous location, she testified she either received help or did not complete the job. [Ex. 2 (Bryant), at 207-209] Bryant cannot recall her supervisor ever telling her she had to stay in a dangerous location if no help was available. [Ex. 2 (Bryant), at 711] If no help was available, Plaintiff would seek another job. [Ex. 2 (Bryant), at 726]

64. Plaintiff was only present at work for two weeks after April 17, 2004 before taking two vacation days, one unpaid personal day, and then calling in sick; upon returning, she was immediately terminated. [Ex. 77; Ex. 78; Ex. 2 (Bryant), at 301-02] The evidence reflects that during these two weeks, Verizon provided Bryant necessary equipment

[Ex. 67, at D 1666], and she has not alleged any facts or evidence with regard to assignment to dangerous neighborhoods.

65. She attributes her work assignments to sex and race discrimination for the same reasons as she attributes her other alleged treatment to discrimination. [Ex. 2 (Bryant), at 216-17]

## Bryant's Retaliation Claim

66. Plaintiff alleges that Verizon retaliated against her by filing "false and unfounded accusations in her personnel file" "when plaintiff exercised her prerogative to refuse a transfer or early retirement." [Ex. 75, at ¶ 9] Plaintiff refused to transfer to the Bronx in October 2003. [Ex. 41] Thus, Bryant's retaliation claim only encompasses documented accusations against her after this time. [E.g., Ex. 79; Ex. 80; Ex. 81; Ex. 73; Ex. 74; Ex. 65; Ex. 64; Ex. 62; Ex. 65; Ex. 66]

67. Although she checks off "Retaliation" on the charge she filed with the Equal Employment Opportunity Commission ("EEOC"), the charge does not allege any protected activity. [Ex. 82]

## sBryant's Failure to Complain or Grieve Her Allegedly Discriminatory Treatment and Other Indications that this Litigation Is Opportunistic

68. Bryant never complained to Verizon management about discriminatory treatment on the basis of her race and/or gender, notwithstanding that she claims to have first experienced discrimination in April 2001, and notwithstanding Verizon's well-publicized policy prohibiting such discrimination and inviting complaints. [Ex. 2 (Bryant), at 63-64, 71, 189, 281; Ex. 47, at D 68, D 75]

69. Even to her union representatives, she never mentioned any allegations of race or gender discrimination or filed a grievance containing such allegations. [Ex. 2 (Bryant), at

192-93, 292, 297-99; Ex. 17 (Sheil), at 28-29, 97]  Bryant never grieved the various minor work issues that she claims evidenced her discriminatory treatment.  [Ex. 17 (Sheil), at 28]

   70. Rather than attribute her termination to race or sex discrimination, Bryant apparently believed at the time of her termination and afterwards that Verizon terminated her due to the fact that she was a long-time employee, who approached retirement.  [Ex. 2 (Bryant), at 321-23 ("[T]hey'll put you out to pasture by any way they can.  By any means necessary.")]  Bryant attributes "[j]ust about everything" that happened to her to her seniority:  "[Y]ou're a few years from your pension, from your retirement and . . . they cut you off at the knees before you even get to that point.  Start finding everything wrong with you."  [Id., at 322-23; Ex. 83, at D 3214 (June 13, 2005 medical records,"[Verizon] harassed her for the last 4 years [prior to her termination] because she was headed for her pension and said 'they found everything wrong with [her].'")]

   71. Bryant was also deposed in a personal injury case in which she testified that she was downsized.  [Ex. 84, at 2692]

72.  On February 11, 2005, Bryant filed a charge with the EEOC.  [Ex. 82]  Bryant filed her Complaint in this action on September 20, 2005 [Ex. 85], and her Amended Complaint on January 31, 2006.  [Ex. 75].  Verizon filed its Answer to Bryant's Amended Complaint on February 21, 2006.  [Id.]

Dated: New York, New York
         December 21, 2007

                        EPSTEIN BECKER & GREEN, P.C.

                        By:   /s/ Michael A. Kalish
                              Michael A. Kalish
                              Carrie Corcoran
                        250 Park Avenue
                        New York, New York  10177-0077
                        (212) 351-4500
                        mkalish@ebglaw.com
                        Attorneys for Defendant
                        Verizon Communications